**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Ader, *et al.*, | No. CV-17-02085-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| SimonMed Imaging Incorporated, *et al.*, | |
| Defendants. | |

At issue is Defendants' Motion for Partial Summary Judgment (Doc. 150, Def. Mot.) and Statement of Facts (Doc. 151, DSOF), to which Plaintiffs filed a Response (Doc. 161, Pl. Resp.), a Controverting Statement of Facts (Doc. 162, Pl. CSOF), and a Supplemental Declaration with Exhibits (Doc. 163), and Defendants filed a Reply (Doc. 166). Also at issue is Plaintiffs' cross-Motion for Partial Summary Judgment (Doc. 152, Pl. Mot.), Statement of Facts (Doc. 153, PSOF), and Declaration with Exhibits (Doc. 154), to which Defendants filed a Response (Doc. 164, Def. Resp.) and a Controverting Statement of Facts (Doc. 159, Def. CSOF) and Plaintiffs filed a Reply (Doc. 165).

For the following reasons, the Court grants in part and denies in part Plaintiffs' Motion and denies Defendants' Motion.

## I.     BACKGROUND

This collective action is brought under the Fair Labor Standards Act ("FLSA") and various state wage and labor laws. Plaintiffs Keith Ader and Jeffrey Cochran and Opt-In Plaintiffs John Cimino, Peter Nerat, and Lawrence Ginsberg (collectively, "Plaintiffs")

were all employed as Field Service Engineers ("FSE")[1] by Defendants SMI Imaging, LLC ("SMI") and SimonMed Imaging Incorporated ("SimonMed"). SimonMed is an outpatient medical imaging and radiology provider. (Doc. 86, Fourth Am. Compl. ("FAC") ¶ 31; Doc. 87, Answer ¶ 31.) Defendant Howard John Simon ("Dr. Simon") is the President, CEO, and sole director of SimonMed, and SimonMed is the only LLC member of SMI. (FAC ¶ 14; Answer ¶ 14; Def. Mot. at 13.)

Although some details surrounding the duties of an FSE are in dispute, the parties generally agree that FSEs perform installations and deinstallations, preventative maintenance, and repairs of medical diagnostic equipment used or operated by SimonMed. Different FSEs may specialize in different machines by different manufacturers. For example, while one FSE might focus on mammography equipment, another may work primarily with Siemens-manufactured CT Scans.

From September 2014—when Ader and Cochran were hired—until April 2017, FSEs were salaried employees and treated as exempt under the FLSA. (*See* PSOF ¶ 59; Def. CSOF ¶ 59.) Consequently, they did not receive overtimes wages during that time period. However, Plaintiffs were told that they could receive compensatory time for weeks in which they worked excessive hours. (*See* Doc. 154 Ex. 13 at 93–94.) The availability of compensatory time allegedly ceased sometime in 2016. In April 2017, Defendants reclassified the FSEs as salaried, non-exempt workers and began paying overtime wages. (PSOF ¶ 41; Def. CSOF ¶¶ 41, 43.) Plaintiffs' exempt status and lack of overtime wages from 2014 through 2017 are at the center of this dispute.

The parties stipulated to conditionally certify an FLSA collective action and opt-in class of FSEs. (Doc. 68.) The Fourth Amended Complaint alleges the following claims:

---

[1] Cochran was technically hired as an "MRI Field Engineer," Ader as a "BioMedical Engineer," Cimino as a "BioMed Engineer," Nerat as a "Modality Service Engineer," and Ginsberg as a "Modality Engineer." (PSOF ¶¶ 2–6; Def. CSOF ¶¶ 2–6.) The parties appear to agree on the term FSE to refer to the position of all Plaintiffs and Opt-Ins just listed. The Court will therefore also employ that term throughout the Order.

Plaintiffs also filed a consent to sue form on behalf of Ruben Hermogino (Doc. 77), but he appears to no longer be in the class. (*See* Doc. 154 Ex. 1 at 86; DSOF Ex. F at 28.)

- Count 1: violations of the FLSA overtime provisions, *see* 29 U.S.C. § 207, on behalf of Plaintiffs and all FLSA class members;

- Count 2: violations of the Arizona Wage Act, *see* A.R.S. § 23-350 *et seq.*, on behalf of Plaintiffs and all class members;

- Counts 3 & 4: retaliation in violation of the FLSA, *see* 29 U.S.C. § 215, on behalf of Ader and Cochran, respectively; and

- Count 5, failure to pay overtime in violation of California state law, *see* Cal. Lab. Code § 1194, on behalf of Ader and Cochran.

Defendants now move for partial summary judgment on the overtime claims in Counts 1 and 5, and on Cochran's retaliation claim, Count 4. (Def. Mot. at 17.) As to the overtime claims, Defendants argue Plaintiffs were properly classified as exempt employees and therefore not entitled to overtime wages. Defendants maintain that even if the Court finds Plaintiffs were misclassified, they are not entitled to overtime because they cannot establish the amount and extent of their overtime worked as a matter of just and reasonable inference. Alternatively, Defendants argue that if the Court concludes Plaintiffs have sufficiently established the amount of overtime worked, Plaintiffs are only eligible for back overtime pay at a rate of one-half their regular rate, as opposed to time-and-a-half. Defendants also move for summary judgment on the issue of whether Dr. Simon is personally liable for any potential wage violations. Finally, Defendants request the court dismiss Cochran's retaliation claim.

Plaintiffs cross-move for partial summary judgment on Count 1. They seek a declaration that they (1) were misclassified as exempt employees, (2) are entitled to liquidated damages in an amount to be proven at trial, and (3) are entitled to an overtime rate of 1.5 times their regular rate of pay, which they argue is based on a 40-hour work week. (Pl. Mot. at 1.)

Additionally, both parties move for summary judgment on the issue of whether Defendants' FLSA violations (if established) were willful, such that the statute of limitations is extended from two to three years.

## II.   LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, the Court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

. . . .

. . . .

. . . .

1    **III.    ANALYSIS**

2        **A.    Learned Professional Exemption**

3        The first issue the Court must answer, and on which all other overtime issues

4    depend, is whether Plaintiffs were properly classified as exempt before 2017. The FLSA

5    mandates that employers pay overtime compensation for time worked in excess of 40 hours

6    in a week unless an exemption applies. 29 U.S.C. § 207(a)(1). Whether an exemption

7    applies is a question of law, but the underlying facts pertaining to an employee's job duties

8    may involve questions of fact. *See Solis v. Washington*, 656 F.3d 1079, 1083 (9th Cir.

9    2011). Thus, if no genuine dispute exists as to an FSE's job duties, the Court can hold as a

10   matter of law that Plaintiffs either do or do not fall into an exemption.

11       As the employer, Defendants bear the burden of establishing an exemption applies.

12   *Klem v. Cty. of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir. 2000). The FLSA exemptions

13   "are to be withheld except as to persons plainly and unmistakably within their terms and

14   spirit." *Id*. The criteria in regulations is "absolute," such that the employer must prove an

15   employee "meets every requirement before the employee will be deprived of the protection

16   of the Act." *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002).

17       Defendants contend the learned professional exemption applies.[2] *See* 29 U.S.C.

18   § 213; 29 C.F.R. § 541.300. For Plaintiffs to qualify for this exemption, their primary duty

19   must (1) require advanced knowledge in (2) a field of science or learning that is

20   (3) customarily acquired by a prolonged course of specialized intellectual instruction.

21   29 C.F.R. § 541.301. Defendants must show all three elements are satisfied; Plaintiffs

22   argue that none are. However, because an FSE's knowledge is not "customarily acquired

23

24 ───────────────
         [2] California's standard for the learned professional exemption is to be construed in
25   accordance with the federal regulations. *Boyd v. Bank of Am. Corp.*, 109 F. Supp. 3d 1273,
     1297 (C.D. Cal. 2015). California's relevant Wage Order provides that a learned
26   professional is an "employee who is primarily engaged in the performance" of work
     "requiring knowledge of an advanced type in a field or science or learning customarily
27   acquired by a prolonged course of specialized intellectual instruction and study, as
     distinguished from a general academic education and from an apprenticeship, and from
28   training in the performance of routine mental, manual, or physical processes, or work that
     is an essential part of or necessarily incident to any of the above work[.]" Ind. Welfare
     Comm'n Order No. 4-2001 § 1(A)(3)(b)(i).

by a prolonged course of specialized intellectual instruction," the Court finds the exemption does not apply and declines to address the first and second prongs.

By including the third prong in the learned professional exemption, the regulations "restrict[] the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession." 29 C.F.R. § 541.301(d).[3] The exemption is not available for occupations that "customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes." *Id.* Nor is it available to occupations "in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction." *Id.*

The parties largely agree on the facts underlying the third prong. It is undisputed that the FSE position does not require a particular academic degree. Indeed, it does not require any degree or completion of college courses. As far as formal academic education, Ader does not possess a high school diploma, but has his GE and an associate's degree in accounting; Cochran took no college courses in engineering or any courses that he believed helped him perform as a FSE; Cimino took some electrical engineering classes part-time at the University of Wisconsin for about a year and has an associate's degree in Applied Electronics from Madison Area Technical College; Nerat took some courses in political science at a community college for half a semester; and Ginsberg took courses at a junior college for two to three years focusing on "electronic technology." (Def. CSOF ¶ 10; Doc. 154 Ex. 2 at 47–48; Ex. 5 at 54; Ex. 4 at 62–63; Ex. 8 at 14–15; Ex. 10 at 13.)

───────────────

[3] The regulations acknowledge that "customarily" means the exemption is also available to "employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction." 29 C.F.R. § 541.301(d). The examples provided are the "occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry." *Id.* Defendants do not contend the FSEs' knowledge or job duties are equivalent to those of, for example, a formally educated and trained engineer. Nor does the Court find the regulations' examples analogous to this case. Accordingly, the Court finds this caveat in the regulations inapplicable.

Defendants therefore focus on the training programs the FSEs attended and instruction they received on specific pieces of equipment, arguing that such specialized instruction satisfies the third prong. Cochran, Cimino, Nerat, and Ginsberg all testified that they underwent some training either through their employment at SMI or in their previous jobs. For example, in the 1980s, Cochran attended "equipment schools" to learn about various pieces of imaging equipment while he worked for another company, EMI. Those programs lasted from one week to two months and were taught by an instructor. During his subsequent twelve-year employment with Mediq Mems, Cochran attended an estimated one to ten such trainings, each lasting one week to several weeks. He completed similar equipment programs for CT scans and MRIs when he later worked for Siemens. And finally, when he began working for Defendants, Cochran completed one week of training on 3T magnets. The purpose of those programs was to learn how to assess, diagnose, and repair the medical imaging equipment. (Def. CSOF ¶ 10; Doc. 154 Ex. 5 at 55–68.)

Other FSEs testified to varying levels of experience with and attendance at similar training programs. Nerat's former employer, Philips Medical Systems, sent him to a training that lasted four months for three machines. Ginsberg holds various certificates and "diplomas" from programs he attended over the years for different employers and machines. Several of those programs lasted six weeks each. Cimino attended a three-week program with SMI for training in mammography equipment. Unlike the others, Ader testified he had no formal training for machines in his specialty. He learned the foundations of electronics while serving in the Navy. During his time with Defendants and former employers, Ader learned by shadowing others, through on-the-job experience, and by asking questions. (Doc. 154 Ex 10 at 31; Ex. 8 at 19; Ex. 4 at 61; Ex. 2 at 48–50, 53.)

The Ninth Circuit recently addressed in detail the third prong of the learned professional exemption in the context of social workers employed by the State of Washington. *See Solis*, 656 F.3d at 1081–1089. That analysis is instructive here. The social worker position at issue required a bachelor's degree in any one of several enumerated studies, ranging from counseling and psychology to criminal justice and anthropology.

However, if applicants did not have a degree from one of the specified fields, they could still qualify with a bachelor's degree in a "social science," such as history or political science, if they also had a specified number of credit hours from one of the first categories of acceptable degrees.

The Court found that such a wide net of acceptable educational backgrounds was not sufficiently specialized because the backgrounds did not all relate directly to the position, as required by the regulations. *Id.* at 1088; *see* 29 C.F.R. § 541.301(d). "The requirement of a degree or sufficient coursework in any of several fields broadly related to a position suggests that only general academic training is necessary, with the employer relying upon apprenticeship and experience to develop the advanced skills necessary for effective performance as a social worker." *Id.* Critically, in reversing the district court's decision, the Ninth Circuit found that the district court gave improper weight to a six-week training program the social workers underwent at the start of the job. "If six weeks of additional training, only four weeks of which is in the classroom, were sufficient to qualify as a specialized course of intellectual instruction, nearly every position with a formal training program would qualify." *Id.*

Another court in this circuit recently held that job-specific training at the beginning of a plaintiff's employment, even in conjunction with many hours of mandatory pre-employment curriculum, did not constitute a "prolonged course of specialized intellectual instruction." *See Boyd*, 109 F. Supp. 3d at 1297. The plaintiffs in *Boyd* were real estate appraisers. To qualify for the job, they had to be certified by a federal certification board, which required a minimum of 75 or 150 hours of core curriculum, depending on the type of appraiser. The plaintiffs were also required to pass an examination approved by the federal certification board and attain 2,000 hours of experience as a supervised trainee. *Id.* at 1300.

Even with this extensive instruction and training period, the court concluded the exemption's third prong was not met. First, although an associate's degree or equivalent was required, the coursework, like in *Solis*, was "not narrowly focused on the [plaintiffs']

position." *Id.* at 1301. Second, the court likened the hours of core curriculum to on-the-job training rather than specialized intellectual instruction. "The courses are not directed at teaching an advanced course of study, rather, they . . . train on the specific skills required for the job." *Id.* at 1302. The court also rejected the defendants' argument that ongoing training requirements are sufficient: continuing education in a field that does not, in the first instance, satisfy the learned professional exemption does not transform the job into one that suddenly does require a prolonged course of intellectual instruction. Finally, relying on the regulations that preclude application of the exemption to "occupations in which most employees have acquired their skill by experience," the court held the requirement of 2,000 hours of supervised training was also insufficient. *Id.* (citing 29 C.F.R. § 541.301(d)). "A period as a supervised-trainee must still be accompanied by specialized instruction." *Id.*

Together, *Solis* and *Boyd* demonstrate Plaintiffs do not qualify for the learned professional exemption. No formal education beyond high school was required for their positions, let alone a specific advanced degree. There was little uniformity in the extent of training each Plaintiff engaged in *before* joining SMI. Cochran and Ginsberg testified to attending many equipment-specific training programs over the years; Ginsberg, just one four-month program; and Cimino and Ader, none. With such variety in both formal education and equipment-specific training, the Court rejects any proposition that either was treated as a "prerequisite for entrance into the profession." *See* 29 C.F.R. § 541.301(d). Whatever minimal commonality existed in their backgrounds—*e.g.*, each worked for at least one other medical diagnostic company before SMI—merely demonstrates the FSEs "acquired their skill by experience rather than by advanced specialized intellectual instruction." *See id.*

As for the equipment-specific training programs Plaintiffs attended while actually employed by Defendants, these do not amount to prolonged intellectual instruction. As stated in *Solis*, if a three-week (Cimino) or one-week (Cochran) program was sufficient to establish the third prong, almost every job that has any kind of formal training period would

also satisfy it, thereby defeating the limited nature of the exemption. The fact that Defendants later instituted a program in which anyone could become an FSE through completion of a 12-month apprenticeship further persuades the Court that the exemption does not apply.[4] *See* 29 C.F.R. § 541.30(d) ("[T]he learned professional exemption is not available for occupations that customarily may be performed . . . with knowledge acquired through an apprenticeship.").

Finally, Defendants cite to *Rutlin v. Prime Succession, Inc.* to argue that a prolonged course of specialized intellectual instruction need not culminate in an academic degree to qualify for the exemption. *See* 220 F.3d 737 (6th Cir. 2000). Defendants' proposition is generally correct; however, their reliance on it is misplaced. The plaintiff in *Rutlin* was a funeral home director and embalmer, a position that required a license from the state. "In order to become licensed, plaintiff had to complete a year of mortuary science school and two years of college, including classes such as chemistry and psychology, take national board tests covering embalming, pathology, anatomy, and cosmetology, practice as an apprentice for one year, and pass an examination given by the state." *Id.* at 742. Thus, while no specific *degree* was required, advanced coursework in particularized classes was. No such licensing or equivalent academic requirements are needed for the FSE position, and Defendants do not argue such.

Accordingly, the Court finds Defendants misclassified Plaintiffs as exempt under the learned professional exemption.

## B.   Overtime as a Matter of Just and Reasonable Inference

Defendants contend that even if Plaintiffs were misclassified, they cannot establish the overtime they allegedly worked. (Def. Mot. at 4.) Accordingly, Defendants move for summary judgment on Counts 1 and 5.

---

[4] In 2017, Defendants created an apprenticeship program for the FSE position. The job description states it is intended to last twelve months and culminate in promotion to FSE. To qualify, an applicant must have an associate's degree or "equivalent military training or work experience." (Doc. 154 Ex. 2 at 185–186; Dep.Ex. 20.)

An employee has the burden of proving that he performed work for which he was not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute on other grounds*. However, where the employer fails to keep adequate records of the employee's hours—as is often the situation in a misclassification case—the employee's burden is lightened. The employee must only (1) prove that he has in fact performed work for which he is owed overtime, and (2) produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 687. This lower standard exists to avoid penalizing an employee and rewarding an employer for the latter's statutory violations. *See id.*

Once an employee establishes the amount and extent of overtime worked as a matter of just and reasonable inference, the burden shifts to the employer to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688. In sum, "an award of back wages will not be barred for imprecision where it arises from the employer's failure to keep records as required by the FLSA." *Brock v. Seto*, 790 F.2d 1446, 1448 (9th Cir. 1986).

Defendants do not dispute that Plaintiffs all at some point worked over 40 hours in a workweek without receiving overtime. (PSOF ¶ 1; Def. CSOF ¶ 1.) It is also undisputed that Defendants did not keep detailed records of the number of hours Plaintiffs worked until 2017, when Defendants began tracking and paying overtime. (Doc. 154 Ex. 1 at 240.) Therefore, the issue before the Court is whether Plaintiffs have produced sufficient evidence to establish the amount and extent of overtime worked as a matter of just and reasonable inference.

Plaintiffs submit deposition testimony, interrogatories, an email communication with a supervisor, and FSE time records from when Defendants began recording overtime in 2017. Plaintiffs admit they can only estimate the amount of overtime worked. However, estimates are not fatal. They are expected, and frequently relied upon in cases where the

employer failed to keep accurate time of an employee's hours. *See, e.g.*, *Alston v. DIRECTV, Inc.*, 254 F. Supp. 3d 765, 788 (D.S.C. 2017) ("[A]n FLSA plaintiff's estimations offered in sworn statements as to the amount of improperly compensated work is, alone, sufficient to meet his initial burden under the [*Mt. Clemens*] framework.")

But while courts and the parties generally agree that estimates are permissible, the crux of Defendants' argument is that Plaintiffs have failed to produce evidence to substantiate those estimates. Courts having ruled on this issue vary widely as to what evidence sufficiently supports a plaintiff's estimates of overtime worked. On the low end, for example, a court has found that the plaintiff's deposition testimony that there were "a lot" of weeks during 2012 in which she worked over 40 hours was enough under *Mt. Clemens* to shift the burden to the employer. *Hanson v. Trop, Inc.*, 167 F. Supp. 3d 1324, 1336 (N.D. Ga. 2016); *see also Velasquez v. U.S. 1 Farm Mkt., Inc.*, 2016 WL 2588160, at *5 (D. Conn. May 3, 2016) (concluding the plaintiffs met their burden based solely on testimony that they worked six days a week for a total of 67 overtime hours); *Clark v. Centene Co. of Tex., L.P.*, 104 F. Supp. 3d 813, 828 (W.D. Tex. 2015) (finding plaintiff met her burden by testifying she recalled working an average of 11 hours per day during Monday through Friday and several Saturdays in a month).

Other courts require slightly more substantiation of a plaintiff's estimates, such as through the use of "triggering factors." In *Allen v. Bd. of Public Edu. for Bibb Cty.*, the plaintiffs were bus drivers, aides, secretaries, and custodians for a school. *See* 495 F.3d 1306, 1310 (11th Cir. 2007). They pegged their estimates to events at the school that required them to stay later. One plaintiff recalled after-school ice cream sales occurring two to four times a week and parent-teacher meetings every six weeks. The court found these more specific recollections sufficiently substantiated the plaintiffs' estimates of overtime under *Mt. Clemens*. *Id.* at 1318. *See also Hurrle v. Reconstructive Hand to Shoulder of Ind. LLC*, 2017 WL 264537, at *4 (S.D. Ind. Jan. 20, 2017) (noting testimony akin to the following might constitute sufficient evidence: "I know I worked an extra two

hours each day during the entire month of April because I started attending an exercise class that began at 7:30 p.m., and I drove there straight from work").

Still others are more rigorous in their application of *Mt. Clemens*. Defendants rely on *Holaway v. Stratsys, Inc.* to argue Plaintiffs have failed to meet their burden. *See* 771 F.3d 1057, 1058 (8th Cir. 2014). *Holaway* has several facial similarities to this case: the plaintiff was a Field Service Engineer who serviced and installed printers; he worked independently out of his home where he waited for assignments; his supervisor dispatched him to client locations to complete jobs. The plaintiff testified that on a weekly basis, he typically spent two to three hours on preparation and three to four hours traveling to locations before his shift began at 8:00am. After his shift ended at 5:00pm, he spent four to five hours on a weekly basis driving to a client's site, three to four hours at a client's site, three to four hours writing expense reports, and one to two hours arranging travel time. He also testified that he typically spent two to three hours on administrative work each weekend. Despite this detail, the Eight Circuit rejected the plaintiff's claim because he "failed to put forth any evidence regarding specific weeks where he worked beyond forty hours." *Id.* at 1059. The Court also found the plaintiff's testimony about his hours was vague, contradictory, and not supported by evidence.

The Court declines to apply *Holaway* for several reasons. First, the Ninth Circuit—and other courts as just noted—appear to take a more relaxed approach to a plaintiff's initial burden in the *Mt. Clemens* framework. For example, in *Brock*, four employees testified they worked over 40 hours a week without overtime pay. The court does not say how or even if the plaintiffs substantiated these estimates. Nonetheless, the Ninth Circuit found their testimony was neither "too unspecific" nor "too speculative," and remanded to the district court to approximate their damages. *Brock*, 790 F.2d at 1447.

The Ninth Circuit has also found that an employee's testimony that he or she worked a range of uncompensated hours can constitute competent evidence. *See Manuel v. Quest Diagnostics, Inc.*, 341 F. App'x 348, 349 (9th Cir. 2009). In *Manuel*, the court held the plaintiff's testimony that she worked overtime between 10 and 20 times during her 30-

minute lunch break and sometimes after work was sufficient to send her claim to the jury, who would then "draw whatever reasonable inferences" from the employee's evidence. *Id.* (citing *Brock*, 790 F.2d at 1448–49).

Further, unlike in *Holaway*, case law in the Ninth Circuit does not indicate that, in the realm of *Mt. Clemens*, a plaintiff's failure to recall specific weeks for which he was not properly compensated dooms his overtime claim. *See, e.g.*, *Buenaventura v. Champion Drywall, Inc. of Nev.*, 2012 WL 1032428, at *2 (D. Nev. Mar. 27, 2012) (finding the plaintiffs' deposition testimony that they regularly worked Monday through Saturday and on an occasional Sunday, and regularly worked over eight hours on the days they worked, was sufficient); *Nash v. Res., Inc.*, 982 F. Supp. 1427, 1435 (D. Or. 1997) (concluding the plaintiff's testimony that he almost always worked six days a week, 10–12 hours a day, without naming specific weeks, established his amount and extent of overtime by reasonable inference). In any event, several Plaintiffs here testified they do not remember a week in which they worked 40 hours or less, other than when they took sick or vacation time. (*E.g.*, Doc. 154 Ex. 2 at 174 75; Ex. 4 at 107–08; Ex. 8 at 53–54.) And although overtime was not documented, Plaintiffs' sick and vacation time was, and therefore can be accounted for by a fact finder.

The Court is also unpersuaded by *Holaway's* applicability here because Plaintiffs' evidence is more corroborated than the plaintiff's there, consists of more than just "bare assertions," *see Holaway*, 771 F.3d at 1059, and utilizes some of the triggering factors that other courts have recognized. The Court now turns to the evidence proffered by Plaintiffs and views it in the light most favorable to them. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Cochran, the most senior FSE, testified in his deposition that Tammy Bankson, who hired him, told him that 8:00–5:00 was the normal workday and that he was expected to maintain that schedule at a minimum. (Doc. 154 Ex. 5 at 50–51.)[5] However, like some of

---

[5] Defendants dispute that FSEs had an 8:00–5:00 schedule, but the Court does not resolve that at summary judgment.

the plaintiffs in the cases mentioned above, Cochran testified he usually worked six days a week for twelve hours a day. He estimated he worked an average of 30 hours of overtime per week. (Pl. CSOF ¶¶ 86, 89.)

Cochran's basis for these numbers include, among other things, the fact that he traveled out-of-state extensively for work, including dozens of trips to California alone, and Defendants considered travel time as work time. (Pl. CSOF ¶¶ 87, 88.) He also estimated he completed several equipment installations yearly. Those took one month to six weeks each, and Ader testified an FSE normally worked ten to eighteen hours a day during an installation. (Doc. 163 Ex. 28 at 82–84; Ex. 25 at 220.) Cochran also testified that preventative maintenance had to be done after-hours or on the weekend—and therefore outside of his alleged 8:00–5:00 schedule—and that it would take four to six hours to complete. (Doc. 163 Ex. 28 at 80–82; Doc. 154 Ex. 5 at 47.) He also recorded his daily start time and stop time in a personal day planner. (Pl. CSOF ¶ 89.) Although he discarded those planners at the end of each calendar year, a fact finder could find Cochran's memory of his overtime was strengthened by the repetition of writing it down every day.

Finally, and perhaps most importantly, Cochran's timesheets from 2017 and 2018 show he worked at least some overtime almost every pay period. The numbers range from 4 hours to 84 hours of overtime and average approximately 25–30 hours of overtime for a two-week pay period. (*See* Doc. 154 Ex. 21.)

Ader likewise testified that Tammy Bankson told him his schedule was 8:00–5:00 but that he worked many hours outside of that, estimating 27–40 hours of overtime per week. (Pl. CSOF ¶ 91; Doc. 163 Ex. 25 at 216.) The numbers are based on, among other things, hours spent on preventative maintenance, which often began at 10pm or later. Like Cochran, Ader traveled for work. In his trips to California, he was usually at the worksite before it opened and after it closed. (Pl. CSOF ¶ 91.) Ader estimated he completed at least eight installations while working for Defendants, each one requiring several weeks of work at ten to eighteen hours per day. (*See* Doc. 163 Ex. 25 at 220.) In June 2016, Ader sent an email to a supervisor, Andrew Braga, inquiring about taking time off. In that email, he

stated he had accumulated about 370 days of compensatory time—meaning that by that point, after 104 weeks of working for Defendants, Ader believed he had worked 2,960 hours (370 days x 8 hours/day) overtime. (Doc. 163 Ex. 41.)[6] This contemporaneously made estimate averages to approximately 28.5 hours of overtime per week and roughly aligns with Ader's later estimates made throughout this litigation.

Nerat estimated he worked an average of 15 hours of overtime each week. Like Ader, this number was tied in part to his recollection of the amount of preventative maintenance he completed outside of his 8:00–5:00 schedule and time spent traveling to worksites, such as in Prescott. (Pl. CSOF ¶ 92.) Cimino similarly estimated that he worked an average of 15–20 hours of overtime per week. (Doc. 154. Ex. 4 at 107.) He testified that he was supposed to be on call from 7:00am–8:00pm every weekday, and Nick Jarrett, an FSE manager, testified the FSEs were compensated for the time they were on call. (Doc. 163 Ex. 31 at 85.) Cimino recalled that his first memory of working overtime was the week he started at SMI, during which he remembered working late into the night and the next day. (Doc. 163 Ex. 27 at 108.)[7]

---

[6] Defendants' Rule 30(b)(6) deponent Zack White testified that there was no official policy regarding compensatory time. It was a loose system where an FSE might be allowed to take some time off if he had been working "excessive" hours. White testified that, for example, if an FSE had a late night the day before, Defendants might not call them to a job the next day. (Doc. 154 Ex. 13 at 92–94.)

[7] The Court notes Ginsberg testified the highest number of hours he recalls working in one week was 60, estimated an average of 15 hours overtime, and did not a recall week in which he did *not* work at least 40 hours. (*See* DSOF Ex. F at 27; PSOF ¶ 55.) Plaintiffs did not specifically address or substantiate Ginsberg's estimates in their briefs. Rather, they refer to the rule in *McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) and *Mt. Clemens*, which "allows district courts to award back wages under the FLSA to non-testifying employees based upon the fairly representative testimony of other employees." *McLaughlin*, 850 F.2d at 589. There, the court awarded damages to 23 non-testifying employees based on the testimony of five employees, which the court concluded established the hours of the non-testifying employees as a matter of just and reasonable inference, despite inconsistencies in the exact days and hours worked. *Id. See also Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp. 3d 1234, 1250 (D. Or. 2014).

The Supreme Court and the Ninth Circuit have both recently held that in an FLSA collective and class action, "even where 'reasonable minds may differ' about whether representative evidence is sufficiently probative of the requirements for liability for a particular cause of action—[*e.g.*], whether it [is] probative of the 'time actually worked by each employee'—that question is to be resolved by the jury." *Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 940 (9th Cir. 2019) (citing *Tyson Foods, Inc. v. Bouaphakeo*,

Finally, as alluded to above, Plaintiffs submitted timesheets for FSEs from after Defendants began recording overtime hours. With the exception of Cochran, they do not pertain to the FSEs in this lawsuit or the relevant timeframe. However, a fact finder could nonetheless draw reasonable inferences from them about Plaintiffs' schedules. The timesheets reveal FSEs consistently worked over 40 hours per week. For example, from June 26, 2017, to February 10, 2019, FSE Anthony Matus averaged 26.7 hours of overtime per week. (Pl. CSOF ¶ 85.) This is distinguishable from *Holaway*, in which no time records existed to corroborate the plaintiff's estimates. That this is a collective action is also germane. Whereas *Holaway* involved a singular plaintiff, here, multiple FSEs all testified to having similar duties and schedules that resulted in working a range of overtime hours. Thus, there is both continuity among the Plaintiffs and corroboration with later timesheets.

In sum, the Court finds Plaintiffs have produced sufficient evidence to substantiate their estimates such that a trier of fact could determine the amount and extent of hours worked as a matter of just and reasonable inference. Defendants will then have the burden to rebut or negate the reasonableness of any inferences the fact finder may draw from Plaintiffs' evidence. *See Mt. Clemens*, 328 U.S. at 688.

## C.   Overtime Rate and Regular Rate of Pay

Both parties move for summary judgment on the issue of Plaintiffs' rate of pay for overtime hours. As discussed more fully below, Defendants request the Court apply the fluctuating workweek ("FWW") method announced by the Supreme Court in *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942), *superseded by statute on other grounds*, which would result in an overtime rate of one-half (.5) Plaintiffs' regular rate of pay. Plaintiffs urge that *Missel* and the FWW method do not apply in misclassification cases, and that the statutorily prescribed overtime rate of one and one-half (1.5) times Plaintiffs' regular rate of pay is appropriate.

The FLSA provides that for all hours worked over 40 in a workweek, an employer must pay its employees "not less than one and one-half times the [employees'] regular

136 S.Ct. 1036, 1049 (2016)).

rate." 29 U.S.C. § 207(a)(1). However, the Supreme Court in *Missel* conceived of a different method for calculating overtime. It held an employer and employee could agree under certain circumstances to a compensation structure where the employee would be paid a flat weekly rate for fluctuating hours without violating the FLSA. *Missel*, 316 U.S. at 581. The arrangement must meet certain conditions: the wages must be sufficient to satisfy minimum wage requirements, and the employer must pay an overtime premium wage of "at least fifty per cent for the hours actually worked over the statutory maximum." *Id*. The rationale behind a lower overtime rate of .5 times instead of 1.5 times is that the employee has already agreed to be compensated for overtime worked at his or her regular rate by means of the fixed weekly wage, or "straight time." *See id.* As one court explained the calculation:

> The employee's regular hourly wage will thus vary from week to week, rising and falling depending on the number of hours she works in a given week (with the statutory minimum wage constituting a floor). For any week in which the employee works more than 40 hours, the employer will still owe the employee an overtime premium. But because the fixed salary is meant to cover the regular rate of pay for all hours worked, the employer will owe the employee only half of the regular rate for any hours in excess of 40, rather than time plus one-half, since by agreement she has already been paid her regular rate for the overtime hours.

*Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 671 (7th Cir. 2010). This method became known as the fluctuating workweek method and was later promulgated by the DOL as an interpretative rule that addresses payment of overtime to salaried employees "who do not customarily work a regular schedule of hours." *See* 29 C.F.R. § 778.114(c).

Neither *Missel* nor the DOL regulations address the applicability of the FWW in a misclassification case. This has spawned three major approaches among courts in how to handle the FWW in the context of a mistaken-exemption. *See Wallace v. Countrywide Home Loans Inc.*, 2013 WL 1944458, at *4 (C.D. Cal. Apr. 29, 2013). The Ninth Circuit has not weighed in.

- 18 -

The first approach, adopted by the First and Tenth Circuits, uses the DOL regulations as the basis for applying the FWW retroactively to misclassification cases. *See Clements v. Serco*, Inc., 530 F.3d 1224 (10th Cir. 2008); *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35 (1st Cir. 1999). The regulations provide:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

29 C.F.R. § 778.114(a).

This approach has been criticized for multiple reasons. First, courts note that the regulations are forward-looking. *See Black v. SettlePou, P.C.*, 732 F.3d 492, 497 (5th Cir. 2013). They permit an employee and employer to agree to such a compensation arrangement going forward without violating FLSA, but they are "not a remedial measure that specif[y] how damages are to be calculated when a court finds that an employer has breached its statutory obligations." *Urnikis-Negro*, 616 F.3d at 666. Relatedly, the regulations require *contemporaneous* receipt of overtime premiums, which by definition are not present when the employee is misclassified in the first place and therefore not receiving any overtime. *Blotzer v. L-3 Commc'ns Corp.*, 2012 WL 6086931, at *10 (D. Ariz. Dec. 6, 2012). The courts who reject this approach also note the regulations were adopted outside the formal rulemaking procedure and therefore entitled to less deference. *Id.*; *Russell v. Wells Fargo Bank & Co.*, 672 F. Supp. 2d 1008, 1016 (N.D. Cal. 2009).

The second approach, adopted by the Fourth, Fifth, and Seventh Circuits and advocated by Defendants here, holds that although *Missel* did not involve a misclassified employee, its logic can be extended to apply the FWW method retroactively in a misclassification case. *See Black*, F.3d 492 at 498; *Urnikis-Negro*, 616 F.3d at 681–82; *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351 (4th Cir. 2011). *Missel* states that an employee and employer can agree to a fixed weekly salary that will constitute payment at the regular rate for any and all hours worked (provided minimum wage requirements are met). The "regular rate" is the weekly salary divided by all hours—not just automatically 40—actually worked in a week. 29 C.F.R. § 778.113(a); *see also Missel*, 316 U.S. at 581. For hours worked over 40, the employer must pay an overtime rate of at least half of the regular rate.[8]

These courts point out that nothing in *Missel* indicates this formula should not apply to cases that involve the same type of agreement—*i.e.*, to be paid a fixed weekly salary regardless of the number of hours worked—but also happen to involve a mistaken-exemption. *See Desmond*, 630 F.3d at 357. In those instances, the parties can still agree to the regular rate of pay for all hours, even though the employer violated the FLSA by not additionally paying the overtime premium for hours worked over 40. The compensatory remedy for that breach is to retroactively award the overtime wages at the rate of one-half the agreed upon regular rate. *See Urnikis-Negro*, 616 F.3d at 680. Crucial to this approach

_____

[8] By way of example, an employer and employee agree to a weekly salary of $1,000 for all hours worked. The employee works 40 hours the first week; 45 hours the next; and 50 hours the third week. Using the FWW method, the regular rate is, respectively, $25/hour, $22.22/hour, and $20/hour. The employee gets no overtime premium for the first week because he did not work over 40 hours. The second week, he receives an overtime premium of $11.11/hour, and the third, $10/hour. The overtime premium is in addition to the regular rate that the employee has already received for *all* hours worked—including those over 40. To further break it down, the employee receives $1000 the first week ($25 x 40 hours); $1,055.45 the second week ($22.22 x 40 hours + $33.33 x 5 hours); and $1,100 the third week ($20 x 40 hours + $30 x 10 hours). If the FWW did not apply in this scenario, the employee would receive $1,000 the first week; $1,187.5 the second week ($1,000 + $37.5 x 5); and $1,375 the third week ($1000 + $37.5 x 10).

1    is the determination that the employee and employer actually intended the weekly rate to

2    compensate not for 40 hours per week or some other fixed number of hours, but for a

3    fluctuating schedule of any and all hours worked in a given week. This analysis is therefore

4    inherently dependent on facts and the intentions of the parties.

5          The third approach is that the FWW generally does not apply to misclassification

6    cases. District courts in the Ninth Circuit are seemingly in accord in this approach, albeit

7    both the content and the depth of the justification and analysis vary by case. In *Blotzer*, on

8    which Plaintiffs heavily rely, the court rejected application of 29 C.F.R. § 778.114 to a

9    misclassification case for the reasons already mentioned, *i.e.*, the regulations are forward-

10   looking, require contemporaneous payment of overtime, and are not binding. *Blotzer*, 2012

11   WL 6086931, at *10 (citing 29 C.F.R. § 778.114); *see also McCoy v. N. Slope Borough*,

12   2013 WL 4510780, at *19 (D. Alaska Aug. 26, 2013) (considering and rejecting the

13   application of the regulations to a misclassification case, but not addressing the straight

14   *Missel* approach); *Monahan v. Emerald Performance Materials, LLC*, 705 F. Supp. 2d

15   1206, 1217 (W.D. Wash. 2010) (same).

16         The Northern District of California recently addressed and rejected the *Missel*

17   approach articulated in *Urnikis–Negro*. *See Boyce v. Indep. Brewers United Corp.*, 223 F.

18   Supp. 3d 942, 949 (N.D. Cal. 2016). It found that *Missel's* central holding was that the

19   FLSA "was designed to require payment for overtime at time and a half the regular pay."

20   *Id.* at 947–48 (quoting *Missel*, 316 U.S. at 578). An employer and employee *can agree* to

21   a different structure if certain conditions are met, but without such an agreement, the default

22   requirement of time-and-a-half applies. In the misclassification context, the parties cannot

23   have reached such an agreement because the compensation structure itself was based on

24   the false premise that the employee is not entitled to any overtime. *Id.* "Thus, there would

25   be no occasion to apply the FWW method in the first place." *Id.* at 948; *see also Zulewski*

26   *v. Hershey Co.*, 2013 WL 633402, at *6 (N.D. Cal. Feb. 20, 2013) ("Despite the existence

27   of persuasive authority to the contrary, the retroactive application of the FWW method in

28   the misclassification context does not square with *Missel*, because *Missel* requires an

- 21 -

agreement between the parties that the fixed weekly salary was compensation for all straight time."); *Wallace*, 2013 WL 1944458 ("[*Missel's*] holding that parties can agree to an employee being paid a fixed rate for all hours worked if certain conditions are met, cannot logically extend to misclassification cases.").

The Court joins its sister courts in the Ninth Circuit—and other district courts throughout the country—in holding that the FWW does not apply in a misclassification case. First, the interpretation of *Missel* employed in *Urnikis-Negro* still requires a mutual understanding between the employer and employee with regards to compensation. The agreement is to receive a straight salary every week, with no receipt of overtime. But, the employee is in fact entitled to overtime, and the employer is legally obligated to pay it. There can accordingly be no true "understanding" when an employee is misclassified. To this point, the Court in *Missel* found that the employment contract at issue was "deficient in complying with the law" for the very reason that it did not include a "provision for additional pay in the event the hours worked required minimum compensation greater than the fixed wage." *Missel*, 316 U.S. at 581. Relatedly, as other courts have noted, the arrangement sanctioned by *Urnikis-Negro* involves a non-exempt employee waiving his entitlement to overtime, "which is, simply, illegal." *Costello v. Home Depot USA, Inc.*, 944 F. Supp. 2d 199, 207 (D. Conn. 2013); *see also Blotzer*, 2012 WL 6086931 at *12; *Russell*, 672 F. Supp. 2d at 1014.

Second, the policies underlying the FLSA would be thwarted by permitting a retroactive application of the FWW to a misclassification case. As the Court in *Missel* made clear, the FLSA is designed not only to ensure a minimum wage, but also to financially drive employers to spread work among more employees through its overtime provisions. A system that allows an employer to illegally pay no overtime in the first place, and then at only half the regular rate in the second place, creates a windfall in damages for employers who violate the FLSA and fails to achieve the more fair distribution of work contemplated by the FLSA. *See Blotzer*, 2012 WL 6086931, at *11–12; *Perkins v. S. New England Tel. Co.*, 2011 WL 4460248, at *4 n.5 (D. Conn. Sept. 27, 2011); *Russell*, 672 F. Supp. 2d at

1014 ("Given the remedial purpose of the FLSA, it would be incongruous to allow employees, who have been illegally deprived of overtime pay, to be shortchanged further by an employer who opts for the discount accommodation intended for a different situation."); *see also In re Texas EZPawn Fair Labor Standards Act Lit.*, 633 F. Supp. 2d at 404–05.

Accordingly, the Court grants summary judgment to Plaintiffs on the applicability of the FWW method and denies it to Defendants. Plaintiffs' regular rate shall be calculated based on a forty-hour workweek,[9] with overtime wages at 1.5 times that rate for hours worked over 40 in a given week.

### D.     Liquidated Damages

Plaintiffs seek a declaration that they are entitled to liquidated damages as a matter of law, the amount of which to be proven at trial. (Pl. Mot. at 7–8.)

Under the FLSA, an employer who violates the overtime provisions "shall be liable" to the employees affected in the amount of their overtime compensation and "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Liquidated damages are therefore mandatory unless the employer shows it acted in subjective good faith and had objectively reasonable grounds for believing its conduct did not violate the FLSA. *Chao v. A–One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003). That is, the employer has the burden to "establish that it had an honest intention to ascertain and follow the dictates of the Act and that it had reasonable grounds for believing that its conduct complied with the Act." *Flores v. City of San Gabriel*, 824 F.3d 890, 905 (9th Cir. 2016) (internal quotations and brackets omitted). The Ninth Circuit describes this as a "heavy burden." *Id.*

Plaintiffs rely on several facts in support of their argument for liquidated damages: (1) a 2015 investigation conducted by the Department of Labor ("DOL"), who concluded SimonMed violated the FLSA overtime provisions with respect to one employee; (2) a

---

[9]Zack White, as SimonMed's Rule 30(b)(6) deponent, testified that the salary was based on 40-hour workweek. (Doc. 154 Ex. 1 at 195 – 96.)

meeting and subsequent settlement agreement between SimonMed's then-Chief Operating Officer Scott Gemberling and the DOL following the same investigation; and (3) a complaint made by former FSE Chris Rute to the FSEs' then-supervisor, Zack White, that SimonMed was not paying its FSEs overtime in accordance with industry standard. (*See* PSOF ¶¶ 25–44.)

Defendants submit in response that White brought Rute's complaint to Gemberling and Tamra Smith, head of Human Resources. White, SimonMed's designated Rule 30(b)(6) deponent, testified that Smith approached SimonMed's General Counsel, Mike Jones, who apparently then told Human Resources that the FSEs were properly exempt. However, because Jones died in 2016, Defendants "cannot say how that determination was made." (Def. Resp. at 8.)

Defendants then briefly and summarily argue the above demonstrates "there were certainly reasonable grounds for believing" the FSEs were properly classified as exempt. (Def. Resp. at 8.) The Court does not agree. Defendants have submitted nothing with respect to what the communications looked like between Smith and Jones or what materials Smith or anyone else provided Jones for his evaluation. The Ninth Circuit recently rejected "[s]uch paltry evidence" as insufficient to show subjective and objective good faith. *Flores*, 824 F.3d at 905. ("That the payroll department consulted the human resources department to find out how a given payment should be categorized in the City's payroll system sheds no light on *how* either department determined that the payment's designation as a 'benefit' complied with the FLSA.")(emphasis in original). Defendants must show they "actively endeavored to ensure compliance," and evidence of simply asking and receiving an answer, without more, is insufficient. *See id*.[10] Defendants' burden is not alleviated by the fact that SimonMed's General Counsel passed away.

---

[10] The case law Defendants cite demonstrates the insufficiency of their evidence of good faith. (*See* Def. Resp. at 8.) In *Perez v. Mountaire Farms, Inc.*, the defendants submitted fourteen letters and memoranda in which their attorney interpreted relevant case and DOL publications and advised the defendants on ways they could maintain compliance with the FLSA. *See* 650 F.3d 350, 376 (4th Cir. 2011) The district court found the defendants "clearly changed its policies" in reliance on their attorneys detailed information and advice. *Id*. In *Samson v. Apollo Res., Inc.*, the defendants consulted with the Assistant

In any event, Defendants waived their right to argue reliance on counsel when their counsel in the present litigation, Mr. Prynkiewicz, expressly told Plaintiffs' counsel they were *not* taking the position that they relied on Jones's advice in classifying FSEs as non-exempt. (*See* Doc. 154 Ex. 1 at 89–90.)

Because Defendants have not met the "difficult burden" of establishing the good faith defense under 29 U.S.C. § 216(b), liquidated damages are mandatory if Plaintiffs prove actual damages. "Double damages are the norm; single damages are the exception." *Haro v. City of Los Angeles*, 745 F.3d 1249, 1259 (9th Cir. 2014) (citing *Chao*, 346 F.3d at 920).

### E.    Statute of Limitations

The parties cross-move for summary judgment on the issue of the applicable statute of limitations. (Def. Mot. at 12–13; Pl. Mot. at 8–9.) Violations of the FLSA are ordinarily subject to a two-year statute of limitations, but the limitations period is extended to three years upon a showing that the employer willfully violated the FLSA. 29 U.S.C. § 255(a). Plaintiffs bear the burden of showing willfulness. *Id.* Mere negligence by the employer in determining its legal obligation is not sufficient, and a court will not presume that conduct is willful in the absence of evidence. *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908 (9th Cir. 2003). Rather, a violation is willful if the employer either: (1) affirmatively knew its conduct violated the FLSA; or (2) recklessly disregarded whether its conduct violated the FLSA. *Chao*, 346 F.3d 908 at 918 (citing *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988)).

Plaintiffs rely on the same facts as above to show willfulness on the part of Defendants. (*See* PSOF ¶¶ 25–44.) The 2015 DOL investigation culminated in its determination that Defendants had misclassified a site supervisor at a California location and unlawfully failed to pay that supervisor overtime. Plaintiffs submit the DOL's report of the investigation and subsequent conference between a DOL representative and Gemberling. (*See* Doc. 154 Dep.Ex. 228.) The report indicates the parties "discussed in

Director for the DOL, who helped them devise and implement salary scheme that would comply with the FLSA. *See* 242 F.3d 629, 641 (5th Cir. 2001).

detail" the requirements under the FLSA during the meeting. The DOL representative explained record keeping requirements, specifically informed Gemberling "that employees have to be paid for all hours worked regardless of if the work was authorized or not," and "explained the [FLSA] exemptions thoroughly." (Doc. 154 Dep.Ex. 228.) Gemberling agreed on behalf of SimonMed to comply with all FLSA provisions in the future and signed a settlement agreement in which, among other things, SimonMed agreed to call the DOL's Wage and Hour Division with any future questions or concerns regarding overtime.

Sometime later in 2015 or 2016, Chris Rute approached Zack White and told him he did not want to continue working overtime without pay. White testified that Rute told White he did not believe the way Defendants paid their FSEs was in accordance with industry standard. (Doc. 154 Ex. 13 at 89–101.) Although White does not recall Rute specifically invoking the FLSA, he stated Rute "impl[ied] that it was against the law." (Doc. 154 Ex. 13 at 96.) White testified that following Rute's complaint, White talked to Gemberling, who instructed White to bring the issue to Tamra Smith, head of Human Resources. (Doc. 163 Ex. 36 at 101–108.) White met with Smith and relayed the concerns raised by Rute. Smith said she would look into it. Several days later, Smith and White had another meeting in which Smith told White she did not think there was a problem with the classification of the FSEs. Although Defendants do not present evidence on how she specifically came to that determination, Smith testified that as a general practice, when approached with a policy question related to employees, she researches online, consults DOL guidelines, and confers with SimonMed attorneys. (DSOF Ex. S at 129.)

The Court finds the parties have raised a triable issue of fact as to whether Defendants willfully violated the FLSA. Plaintiffs have submitted evidence that Defendants were on notice of possible FLSA violations, and Defendants have submitted evidence that White and Smith took some steps to look into the same. The fact finder must to determine the extent of Smith's investigation into Rute's concerns regarding FSE overtime, and whether such investigation constituted an "adequate further inquiry" under the statute. 29 C.F.R. § 578.3(c) ("An employer's conduct shall be deemed to be in reckless

disregard of the requirements of the Act . . . if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry.")

Accordingly, the Court denies summary judgment to both parties on the issue of the applicable statute of limitations.

### F.    Dr. Simon's Individual Liability

Defendants move for summary judgment on the issue of Dr. Simon's personal liability, arguing he is not an employer under the FLSA. (Def. Mot. at 13.) Only "employers" are liable for FLSA violations. 29 U.S.C. § 216(b). The Act defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Ninth Circuit states the definition "is to be given an expansive interpretation." *Lambert v. Ackerley*, 180 F.3d 997, 1011–12 (9th Cir. 1999).

Where a corporate officer "exercises control over the nature and structure of the employment relationship, or economic control over the relationship, that individual is an employer within the meaning of the Act, and is subject to liability." *Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th Cir. 2009) (internal quotations omitted). The Ninth Circuit applies a four-factor "economic reality" test that considers whether the individual (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *disapproved of on other grounds*. These factors are not exclusive or "etched in stone," and no one factor is controlling. *Id.* The existence of an employer-employee relationship depends upon the relationship and the circumstances as whole. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).

Plaintiffs submit evidence that Dr. Simon had the power to hire and fire employees, and sometimes took an active role in doing so. (Pl. CSOF ¶ 100.) For example, Zack White testified that Dr. Simon directed him to terminate Ader's employment as part of a shift in

Defendants' business model that Dr. Simon was pursuing. (Pl. CSOF ¶ 101; Doc. 163 Ex. 24 at 170–71.) When Defendants acquired other diagnostic imaging sites or facilities, Dr. Simon appeared to be active in determining whether to onboard the FSEs of the acquired facilities or hire new ones. Former Chief Operating Officer Von Doss testified that when Defendants were contemplating switching FSEs to non-exempt status, a transition that would inherently result in changes in an FSE's compensation structure, Dr. Simon told him to "get it done." (Doc. 163 Ex. 29 at 108–09.) Managers and the payroll department reported FSE salary and payroll records to Dr. Simon. (Pl. CSOF ¶¶ 115–16.)

As for control over FSEs' work schedules and employment conditions, Dr. Simon was involved in decisions regarding whether to provide FSEs with employer-owned vehicles to use in traveling to worksites. Dr. Simon sometimes sent FSEs, either directly or indirectly, to specified jobs, and Cochran testified that he sometimes directly reported the results back to Dr. Simon. (Pl. CSOF ¶¶ 109, 117; Doc. 154 Ex. 5 at 106–110.) Dr. Simon made decisions as to which equipment was to be repaired and maintained by Defendants' FSEs as opposed to third parties, and vice versa. (Pl. CSOF ¶¶ 110.)

Plaintiffs have presented sufficient facts from which a trier of fact could conclude Dr. Simon exercised control over the nature and structure of the FSEs' employment, or economic control over the same. Defendants do not meaningfully attempt to rebut Plaintiffs' evidence or produce controverting evidence. Accordingly, the Court denies summary judgment to Defendants on the issue of Dr. Simon's personal liability.

### G.    Cochran's Retaliation Claim

Defendants move for summary judgment on Count 4, Cochran's retaliation claim. (Def. Mot. at 16–17.) The FLSA makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding" under the FLSA. 29 U.S.C. § 215(a)(3). The anti-retaliation provision is to be interpreted expansively, *Rosenfield v. GlobalTranz Enters., Inc.*, 811 F.3d 282, 286 (9th Cir. 2015), and

encompasses protection for complaints made to employers or to the DOL directly. *Lambert*, 180 F.3d at 1004.

To establish a *prima facie* case of retaliation, a plaintiff must show (1) he engaged in activity protected by the FLSA; (2) the defendant took an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action. *Peak v. Forever Living Prod. Int'l Inc.*, No. CV-11-00903-PHX-SRB, 2013 WL 12198834, at *9 (D. Ariz. Aug. 26, 2013). "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). If a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to provide a legitimate, nonretaliatory reason for the adverse employment action. *See Spata v. Smith's Food & Drug Ctrs., Inc.*, 253 F. App'x 648, 649 (9th Cir. 2007) (applying the *McDonnell Douglas* burden-shifting framework to FLSA retaliation claims). If the defendant provides such a reason, the burden shifts back to the plaintiff to show the proffered reason is pretextual. *Id.*

Before the Court is the following evidence. In March 2017, Cochran received a performance evaluation in which he was rated as either "exceeding expectations" or "consistently exceeding expectations" in eight of ten categories, and "meeting expectations" in two categories. (*See* Doc. 163 Dep.Ex. 96.) Cochran was recommended for a pay increase in the same review. Several months later, he was promoted to Senior Technical Field Service Engineer and received a raise. (Pl. CSOF ¶ 129.) Zack White described Cochran as a good engineer and sent him to Nevada to assess a problem when the third-party engineers at that site were unsatisfactory. (Pl. CSOF ¶¶ 126, 130.)

Plaintiffs filed the first Complaint in this action on June 29, 2017. (Doc. 1.) In November of that year, Michael Bankson began overseeing FSEs. At some point, Cochran complained to Bankson that Defendants were not keeping track of and recording all of Cochran's hours ("the timekeeping complaint"), and Bankson testified that he (Bankson) relayed this complaint to Dr. Simon. (Doc. 163 Ex. 26 at 138–39.) On January 24, 2018,

Bankson and Cochran had a meeting in which Bankson raised performance issues related to three incidents involving Cochran. Bankson memorialized these issues in an email to Cochran that same day. (*See* DSOF Ex. V.) After the January 24 meeting, Bankson learned about another incident on January 30 in which Cochran allegedly failed to return a machine part for a job. (DSOF Ex. D at 221–223.) Bankson terminated Cochran's employment effective February 2, 2018. (FAC ¶ 10.)

The Court preliminarily notes that, presumably due to the wealth and complexity of the other issues addressed in the parties' briefs and above, each party devoted just two pages to Cochran's retaliation claim. Defendants first argue Cochran cannot establish the third element of a *prima facie* case of retaliation because Bankson was unaware that Cochran was involved in present lawsuit. (Def. Mot. at 17; *see* DSOF Ex. U at 250.) Plaintiffs respond that Bankson's testimony is insufficient to defeat Cochran's retaliation claim and is a credibility issue for the trier of fact, and that, in any event, other evidence raises the inference that Dr. Simon was involved in Cochran's termination.

In *Schultz v. Wells Fargo Bank, Nat. Ass'n*, the plaintiff complained to Human Resources about an incident with her manager, Klinetobe; six months later, the plaintiff's direct supervisor, Trupp, transferred and demoted her. *See* 970 F. Supp. 2d 1039, 1048–49 (D. Or. 2013). At summary judgment, the defendant argued the plaintiff could not show causation because Trupp testified he did not know about the plaintiff's complaint to human resources. The court rejected this, finding sufficient evidence existed to give rise to an inference that Trupp knew. For example, Trupp was included on emails preceding the incident between the plaintiff and Klinetobe. And because Trupp and Klinetobe "worked closely together," it was reasonable to infer the latter told the former about the plaintiff's complaint. The court found that "[e]valuating the credibility of Trupp's testimony [that he did not know about the complaint] is an issue for the jury, not for the court at summary judgment." *Id.* at 1061.

Here, it is undisputed that Bankson knew about the lawsuit. (DSOF Ex. U at 246.) Plaintiffs have proffered evidence that Bankson and Dr. Simon conferred about

employment issues concerning FSEs. An email thread between the two shows they specifically discussed Cochran and an incident later referenced in Bankson's January 28 email. (Doc. 163 Dep.Ex. 104.) Bankson also testified that he had a "brief conversation" about Cochran with Dr. Simon and others before Bankson terminated Cochran. Further, Bankson told Dr. Simon about Cochran's timekeeping complaint, an issue generally pertaining to the same subject matter of this lawsuit. Like in *Schultz*, these facts could give rise to an inference that either (1) Bankson knew about Cochran's involvement in this suit, and/or (2) Dr. Simon, who indisputably knew about the lawsuit and Cochran's timekeeping complaint, directed or influenced the decision to terminate Cochran. Finally, Cochran testified that Bankson singled him out and treated him differently than the rest of the FSEs, put Cochran on a less desirable shift over his objection, and told Cochran he was the worst engineer Bankson had ever seen. (Pl. CSOF ¶¶ 200–04.) *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005) ("[C]ircumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference [of causation].").

Accordingly, the court finds Cochran has produced sufficient evidence from which a trier of fact could infer a causal connection between Cochran's protected activity and his adverse employment action.

However, the analysis does not end there. Defendants have set forth a legitimate, nonretaliatory basis for Cochran's termination: the performance issues outlined in Bankson's January 24 email and the subsequent January 30 issue. The burden thus shifts back to Cochran to demonstrate this was pretextual. *See Spata*, 253 F. App'x at 649. The Court notes here that the temporal proximity of seven months—the time between this lawsuit and Cochran's termination—is likely insufficient by itself to establish a retaliation claim. *See, e.g.*, *Anderson v. City & Cty. of San Francisco*, 169 F. Supp. 3d 995, 1028 (N.D. Cal. 2016). However, as discussed below, other circumstances give rise to a triable issue as to whether Cochran's termination was pretextual.

First, Cochran disputes the accuracy of some of what allegedly formed the basis for his termination. Regarding one incident, Bankson wrote Cochran showed a "lack of

judgment" in failing to escalate an issue he encountered on a job. (*See* DSOF Ex. V.) However, Cochran testified that he did escalate the issue to Zack White and two other named managers. (Doc. 163 Ex. 28 at 210.) As to another incident, Bankson stated in his January 28 email that a regional manager had complained about Cochran's attire, attitude, and lack of professionalism. (DSOF Ex. V.) However, Cochran testified that Bankson never mentioned Cochran's attitude or professionalism in the in-person meeting—Bankson reprimanded him for allegedly wearing "holey" jeans, and Cochran denied owning jeans with holes in them. (Doc. 163 Ex. 28 at 208–210.) There is also some dispute as to whether Cochran was working on the date of that incident. (DSOF Ex. H at 221–223.) Accordingly, Cochran raises a genuine dispute as to whether the nonretaliatory basis for Cochran's termination is factually supported.

Moreover, Cochran had solid performance reviews and was promoted just prior to this lawsuit, which can support an inference of pretext. Finally, as already noted, Cochran complained to Bankson about Defendants' timekeeping, and Bankson told Dr. Simon about this complaint. This can constitute its own instance of engagement in a protected activity. Cochran was terminated within—at most[11]—a few months of the timekeeping complaint. "Proximity in time between the protected action and the allegedly retaliatory employment decision is one way a jury logically could infer that the plaintiff was terminated in retaliation." *Dawson*, 630 F.3d at 937 (brackets omitted).

Viewing the evidence in the light most favorable to Cochran, as it must at this stage, the Court finds Cochran has produced sufficient evidence regarding causation and pretext such that a reasonable juror could find he was retaliated against. The Court therefore denies Defendants summary judgment on Count 4.

## IV.   CONCLUSION

The Court grants summary judgment to Plaintiffs as to the following issues: (1) Plaintiffs were misclassified as exempt under the FLSA; (2) Plaintiffs' overtime rate

---

[11] Bankson began overseeing Cochran sometime in November 2017 and Cochran was fired on February 2, 2018.

shall be calculated at 1.5 times their regular rate, which itself is based on a forty-hour workweek; and (3) Plaintiffs are entitled to liquidated damages in an amount to be proven at trial, if they have proven actual damages. The Court denies summary judgment to Defendants as to Dr. Simon's individual liability and as to Cochran's retaliation claim. Finally, the Court denies summary judgment to both parties on the issue of willfulness under the FLSA.

**IT IS THEREFORE ORDERED** granting in part and denying in part Plaintiffs' Motion for Partial Summary Judgment (Doc. 152) and denying Defendants' Motion for Partial Summary Judgment (Doc. 150).

Dated this 10th day of June, 2020.

_____
Honorable John J. Tuchi
United States District Judge